1814

In the Interest of JAMAL RASHEE A., a juvenile under
the age of seventeen, Appellant.

(418 S.E. (2d) 326)

Court of Appeals

*Gregg Meyers,* of *Wise and Cole,* Charleston, *for appellant.*

*Atty. Gen. T. Travis Medlock, Asst. Attys. Gen. Harold M.
Coombs, Jr.,* and *Amie L. Clifford,* Columbia, and *Sol.
Charles Molony Condon,* North Charleston, *for respondent.*

Heard April 6, 1992; Decided May 11, 1992.

Reh. Den. June 30, 1992.

SHAW, Judge:

Appellant, a juvenile, was adjudicated delinquent for the commission of first-degree burglary and grand larceny. We reverse.

The record reveals the following undisputed facts. On

November 5, 1990, at approximately 10:00 p.m., the Mc-Knights were in their carriage house, where they were living while their main house was being renovated, when Mrs. McKnight heard noises in the attic area of the main house, directly above their carriage house bedroom. At that time, the attic was being used to store fixtures, appliances, tools and building materials for the renovation of the main house. Upon hearing the noises, Mrs. McKnight awoke her husband, who then heard the sounds as well. Mr. McKnight then entered the main house with a flashlight to light his way, other artificial light being inaccessible at that moment due to the renovations. He heard a loud thud, pointed the flashlight up some stairs and observed a black male approximately four feet away from him on the steps. He chased him up the steps where the person joined another individual and then followed the two out onto a porch. He stated he got a much better look at the face of the second individual out on the porch, as the first individual, a taller young man, almost immediately jumped from the second floor porch, while the second individual, a shorter young man, "momentarily hesitated and then jumped from the second floor porch to the ground striking the first floor porch on the way down." After they jumped from the porch, Mr. McKnight was unable to visually observe them any longer. However, he stated that the "heard sounds of people getting on the bicycles and speeding off, and the rattling of the bicycles and that sort of thing." Mrs. McKnight testified that she was standing outside during this time and "saw two young men pedaling on their bicycles as fast as they could. . . ." Mr. McKnight described the first youth he encountered as 5'6" or better and the second as 5'6" or less. Both boys had relatively short hair and one or both were wearing red tops and dark pants. He also stated he got a better look at the second youth, although "it was only a moment." Mrs. McKnight could only describe the individuals as wearing tennis shoes. Mrs. McKnight phoned the police and an officer arrived between 20 and 30 minutes after the incident.

Officer Lemon, with the City of Charleston Police Department, testified his team office received a call regarding this incident at 10:30 p.m. and, upon checking the area, he observed "two guys riding on a bike." He stated that one was operating the bicycle and the other was on the handlebar. He observed

these individuals within one minute of receiving the 10:30 call. Officer Lemon detained the two juveniles and Mr. McKnight arrived at the location and indicated these were the same individuals he had seen in his house that night.

The defense presented the testimony of Evette Martin. Ms. Martin testified that on the night of November 5, 1990, between 10:00 and 10:35, the appellant was at the Hardee's where Ms. Martin worked. She stated that appellant and his friend arrived at 10:00, that the appellant went with her to take out the trash and she remembered him leaving at 10:35 because she was cleaning the lobby at the time and looked at a clock.

The defense also presented the testimony of a private investigator that testified over 500 red t-shirts had been recently distributed to area youth through an inner city program. The appellant testified on his own behalf. He stated he had never been in the McKnight residence. He further testified, on November 5, 1990, he left a friend's house with another friend around 10:00 p.m., went to Hardee's where he talked to Ms. Martin and helped her take the trash out, and left the Hardee's, shortly thereafter being stopped by the police.

A police department inventory of the appellant's clothing at the time of his detention indicates the appellant was wearing black shoes, white socks, black sweat pants and a white and pink t-shirt. The record further reveals, and the State stipulated that a hat was recovered at the scene of the crime and hair samples, voluntarily given by the appellant and the other suspect, were tested by SLED and determined to be microscopically inconsistent with hairs found on the hat.

The appellant contends the family court judge erred in finding the state proved its case beyond a reasonable doubt. He argues the eyewitness identification was unreliable under the circumstances and this was the sole evidence supporting the trial judge's adjudication. We agree.

Following the closing of all evidence, the trial judge stated as follows:

> I have tried very hard to consider all of the evidence which has been offered in this case. I am reminded of the instructions I have heard in General Sessions Court that judges give the juries over the years, about the burden of proof and the definition of reasonable doubt.

> There is no case against any defendant ever which has been [immune] to all doubt whatsoever, no matter what the evidence is against the accused, there can always be some possibility of doubt. The question is, is that a reasonable doubt.
>
> Considering all the evidence, and there is a great deal to consider in this case, I do entertain some doubt. However, on giving this matter a great deal [of] reflection, I believe that doubt does not rise, however, to a reasonable doubt.

Clearly, the sole basis for the adjudication was the eyewitness identification by Mr. McKnight. The rest of the evidence presented at trial was either neutral, or else facilitated the defense. Of particular importance is the uncontroverted evidence that a cap was found at the scene which contained hair belonging to neither of the suspects. Further, a strong alibi was presented by the defense, with no indication of unreliability other than the possible inference that the witness was swayed because she was a friend of the appellant's. The description of clothing given by Mr. McKnight was in some respects inaccurate and, given the evidence presented on the number of red t-shirts distributed to the community, provides no reliable corroborating evidence to the eyewitness identification. Further, the McKnights both indicated the perpetrators rode away on individual bicycles while the appellant and his friend were stopped on only one bicycle.

We thus turn to the validity and reliability of the eyewitness identification in the case at hand. Here, there was no in court identification. Neither was there a photographic or physical line-up. Rather, Mr. McKnight was taken to the location of the detention of appellant and his friend. There were no other individuals being detained at that time. Clearly, the show-up identification was suggestive. However, the question is whether the pretrial identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. *State v. Ford,* 278 S.C. 384, 296 S.E. (2d) 866 (1982). The reliability of an identification depends on the facts of the case and must be determined by considering the totality of the circumstances. *State v. Drayton,* 293 S.C. 417, 361 S.E. (2d) 329 (1987). Fac-

tors to consider in evaluating the likelihood of misidentification include: (1) the opportunity of the witness to view the accused; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.*

Turning now to the facts of this case, we recognize that the witness indicated at trial a high degree of certainty and that the length of time between the crime and confrontation was relatively short. The record shows Mr. McKnight's degree of attention may have been high given that he was the victim of a crime, however, there is no indication it was greater than any other eyewitness victim. McKnight's prior description was vague and, as previously noted, somewhat inaccurate. Further, the evidence showed a likelihood that many inner city youth were given red t-shirts; the same as described by Mr. McKnight.

Of notable importance in this case is the fact that the witness' opportunity to view the accused was poor. The lighting was very bad, although McKnight was within approximately four feet of the individuals, his observation was of no significant duration and Mr. McKnight indicated "things were happening rather quickly." *See State v. Scipio*, 283 S.C. 124, 322 S.E. (2d) 15 (1984) (wherein the Supreme Court, in finding an identification reliable, placed great emphasis on the fact that the victim observed the appellant standing within arms length for a period of 4 to 4½ minutes in a well-lighted store). Considering the other factors in light of this one, we find the totality of the circumstances make the reliability of the eyewitness identification questionable at the very least.[1]

Based on the unreliability of the eyewitness identification, the fact that little, if any, corroborating evidence was produced at trial, and the fact that the defense presented strong evidence that appellant was not the perpetrator of this crime, we hold the state failed to prove, beyond a reasonable doubt, the appellant's guilt.

---

[1] We further note that the appellant argues, and there is some evidence of, the existence of racial insensitivity on the part of the witness. While we do not rely on this to find the identification unreliable, it is a proper consideration in determining the likelihood of misidentification.

Reversed.

Sanders, C.J., and Gardner, J., concur.